Opinion issued August 29, 2013



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-11-01112-CR

————————————

**R.T. HARDGE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from 180th District Court
Harris County, Texas
Trial Court Case No. 1223224

## MEMORANDUM OPINION

A jury convicted R.T. Hardge of capital murder and the trial court assessed

his punishment at imprisonment for life without parole.[1]  In four points of error, appellant argues that (1) the evidence is insufficient to support his conviction, (2) the trial court erred by denying his motion to suppress the DNA comparison results, (3) the trial court erred by denying the motion to suppress statements appellant made to law enforcement because the statements were the product of police coercion, and (4) the trial court erred in admitting eight photographs that were more prejudicial than probative.

We affirm.

### Factual Background

On October 31, 2008, 78-year-old Luz Marti was found sexually assaulted and murdered in a narrow alcove between the stairs and the wall of the Sacred Heart Co-Cathedral in downtown Houston, Texas.  Marti's body was discovered early that afternoon by Father Bob Brooks and Diantha Brennan, an administrative assistant for the church, who called 9-1-1.  According to Brennan, Marti's face was badly swollen and bruised, she was partially clothed, and her genital area was exposed.

Brennan recognized Marti immediately because Marti was a parishioner who had regularly attended Mass at the Co-Cathedral.  Brennan testified that although

---

[1]     *See* TEX. PENAL CODE ANN. § 12.31(a) (West 2011), § 19.03(a)(2) (West Supp. 2012).

homeless, Marti felt safe at the church and considered the church her home. Marti often slept on the top step of the stairs next to the alcove where her body was found. Brennan, who regularly saw Marti at Mass and spoke with her on several occasions, testified that although Marti was homeless and appeared to have a mental illness, she was always neat and clean and she behaved appropriately and never gave Brennan any cause for concern. Brennan testified that Marti always wore the same clothing (i.e., red and white checked Capri pants, white tennis shoes, a red cotton short-sleeved shirt, and a red sweater) and always carried the same belongings with her (i.e., a blue plastic rosary, several plastic crucifixes, two or three scapulars,[2] a Bible, a bilingual missal, a prayer book hymnal, and a red and white plastic ankle bracelet).

Sheridan Langford, a crime scene investigator with the Houston Police Department, was dispatched to the church that afternoon to photograph and videotape the crime scene. Langford testified that upon her arrival she observed Marti, a partially clothed elderly deceased woman, lying in a small alcove between the church's east wall and a staircase leading to a door into the cathedral. Neither the alcove nor the body was visible from the street, which was approximately 140 feet away.

---

[2] A scapular is a pair of small cloth squares joined by shoulder straps and worn under the clothing on the breast and back as a sacramental.

According to Langford, Marti was wearing a maroon sweater, a white Adidas tennis shoe on her left foot, and a beaded ankle bracelet on her left ankle. Marti's pants and panties were missing and a blood stained, blue-green towel was partially covering her body. Langford testified that although she did not know how long Marti's body had been in the alcove, signs of insect activity in one of Marti's nostrils indicated that Marti had been deceased for several hours.

Langford also found a green rosary and a cross next to Marti's left knee, a second tennis shoe near Marti's right knee, and a drawstring mesh bag with Marti's personal belongings next to Marti's head. Marti's state-issued identification card was inside the mesh bag, along with a Bible, a bilingual missal, and a prayer book hymnal that were wrapped up in an American flag bandana. A smaller blue bag with various toiletry items and a bus pass belonging to Marti was also found inside the mesh bag.

Trace evidence analyst Diana Wolfshohl, forensic investigator Vanessa Trevino, and HPD Investigator Arnauld Semmelrock were also dispatched to the scene later that afternoon. Wolfshohl, who documented the physical evidence found on or near Marti in the alcove, noticed that Marti was wearing a rosary and a scapular around her neck. Trevino documented the severity of Marti's injuries, including contusions to her face, knees and thighs, hemorrhaging in her eyes, and the bloody tears to her vaginal area. Based on body temperature, Trevino

4

estimated that she had been deceased for twelve to twenty-four hours.[3]

Semmelrock, one of the homicide investigators assigned to the case, testified that the blood and evidence collected at the scene was contained in the confined space where Marti was found, indicating that she was not moved there after she was injured and that the entire crime took place in that area.

After Marti's corpse was removed from the crime scene, Langford obtained DNA samples from the blood stains on the north and east walls of the alcove. She also observed a sizeable bloodstain on the brick pavers underneath where Marti's groin had been. While performing the autopsy, Dr. Roger Mitchell collected DNA samples from underneath Marti's fingernails, and semen from her vagina and rectum. This evidence resulted in a DNA profile which was entered into the national Combined DNA Index System (CODIS).

On January 5, 2009, Semmelrock received information that the suspect DNA profile matched appellant, who was arrested a few days later at a McDonald's about one block from the crime scene and brought to the police station for questioning. Appellant was calm and able to communicate, and he was offered food, water. and access to the bathroom. Although appellant waived his statutory rights and spoke with investigators, he denied being at the crime scene, committing

---

[3]     Trevino testified that she took Marti's body temperature at 7:15 p.m. on October 31, 2009. Based upon Trevino's estimate, Marti died sometime between 7 p.m. on October 30, 2009 and 7 a.m. the next morning.

5

the crime, or knowing Marti. Appellant also adamantly denied frequenting downtown or associating with people who lived there. After investigators showed appellant a photograph of Marti and told him that somebody had identified him as being with her, appellant confidently stated that "ain't nobody in this world gonna say that I was with that woman right there, in this world. Nah." Investigators also asked appellant for a sample of his DNA in order to verify his claim that he did not assault Marti. When appellant refused their request and told them several times that they already had a sample of his DNA on file, investigators obtained a search warrant authorizing them to seize a sample.

Semmelrock also testified that in mid-February 2009 he attempted to search appellant's apartment, but when he arrived at the apartment complex, he discovered that the management had just evicted appellant and discarded his belongings in a dumpster. Semmelrock testified that he retrieved a pair of women's red panties from the dumpster and submitted them for DNA testing.

The sample of appellant's DNA that investigators collected from appellant was compared to the DNA evidence recovered from the scene by DNA analyst Robin Guidry.[4] Guidry testified that appellant's DNA could not be excluded from the vaginal and rectal swabs, the east and north wall swabs, from the blue rosary

---

[4] Serologist Karen Ginco tested the evidence taken from the crime scene and Marti's body, and found blood and semen on the following items: the vaginal swab, the rectal swab, the north wall swab, the east wall swab, the blue rosary, the white-laced scapular, the cross necklace, and the blue towel.

beads and scapular worn around Marti's neck and her beaded ankle bracelet, and from underneath the fingernails of Marti's left hand. Although semen was found on the red panties, there was not enough DNA to run a comparison. Guidry testified that the blue rosary beads that Marti was wearing around her neck had a mixture of DNA from Marti, appellant, and another unknown individual. She also testified that DNA analysis cannot determine when DNA was deposited on a tested substance, and that the DNA from the third contributor could have been from the person who originally sold the rosary to Marti.

Dr. Mitchell, the medical examiner who performed Marti's autopsy, concluded that Marti was sexually assaulted at or near the time of her death, and he ruled her death a homicide. According to Dr. Mitchell, Marti's death was caused by multiple acts of blunt force trauma, including a blow to her face severe enough to fracture her nose and cause her brain to bleed, and asphyxiation due to compression of her neck. Dr. Mitchell also testified that the strangulation marks on Marti's neck were in a beaded pattern consistent with the blue rosary that she was wearing when her body was discovered.

Dr. Mitchell testified that Marti's vagina was torn almost to her rectum. He also found a bruise on her rectum and another four-inch laceration or tearing of the wall of the vagina on the left side going in towards and reaching the cervix. Dr. Mitchell testified that these injuries were consistent with penile rape. Conceding

7

that it was not possible for his examination to determine if the person who murdered Marti also sexually assaulted her, he testified that although it was *possible* that Marti's sexual assault and murder happened at different times, it was not *probable*. Because the injuries from Marti's sexual assault showed no evidence of healing and were consistent with the bruises to her face, neck, and body, Dr. Mitchell concluded that Marti was beaten, strangled, and sexually assaulted at or near the time of her death.

## Procedural Background

### A. Motion to Suppress Evidence

Appellant filed a motion to suppress his DNA sample in CODIS in which he argued that his DNA sample was obtained by law enforcement during the investigation of a sexual assault charge against him,[5] that the charge was subsequently dismissed and that the sample should have been destroyed thereafter pursuant to Government Code section 411.1471(e).[6] According to appellant, the inclusion of his DNA sample in CODIS after dismissal of the prior case violated

---

[5] Appellant's motion to suppress states that the DNA sample "should have been destroyed after the dismissal of his 1990 rape case." This is most likely a typographical error because there is no reference to a *1990* sexual assault charge in the State's notice of its intention to use evidence of prior convictions and extraneous offenses or anywhere else in the record.

[6] TEX. GOV'T CODE ANN. § 411.1471(a)(1)-(2), (e) (West 2012) (requiring collection of DNA specimen from defendant after indictment, or waiver of indictment, for certain offenses and requiring DNA specimen and record of its receipt be immediately destroyed if defendant acquitted or case against defendant dismissed).

his right to privacy and his right to be free from unlawful searches and seizures pursuant to the Fourth Amendment of the U.S. Constitution and article 1, section 9 of the Texas Constitution. Appellant argued that Code of Criminal Procedure article 38.23 required the suppression of this illegally obtained DNA evidence. *See* TEX. CODE CRIM. PROC. art. 38.23 (West 2005) (requiring exclusion of evidence that was unlawfully obtained).

At the beginning of the pre-trial suppression hearing, the State discussed appellant's lengthy criminal history, which included, inter alia, convictions for burglary (1983), burglary of a habitation (1984), burglary of a building (1987 and 1988), and auto theft (1987) in which appellant was sentenced to TDCJ, and the State acknowledged that it was "unclear about in which of these cases [appellant] submitted his bucal swab."[7] Nevertheless, the State represented that the DNA

---

[7] The State's notice of its intention to use evidence of prior convictions and extraneous offenses also indicates that appellant was convicted of the offense of unauthorized use of a motor vehicle in March 2000 and sentenced to twelve years in TDCJ and that appellant was on community supervision until 2011. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 11(j) (West Supp. 2012) ("A judge granting community supervision to a defendant convicted of a felony shall require that the defendant, as a condition of community supervision, provide a DNA sample under Subchapter G, Chapter 411, Government Code, for the purpose of creating a DNA record of the defendant, unless the defendant has already submitted the required sample under other state law.")

Since at least September 1, 2005, Government Code section 411.148 has required that all prison inmates provide blood samples or other specimens to be included in the CODIS DNA database. TEX. GOV'T CODE ANN. § 411.148(a)(1)(B), (b) (West 2012). Although appellant was sentenced to twelve years in TDCJ in 2000, the record does not indicate whether appellant actually served any of this sentence.

9

sample was taken lawfully and that it was appellant's burden to prove otherwise. The State further argued that Government Code section 411.1471(e) was inapplicable because this section—which was enacted after appellant's arrest for the 1999 sexual assault case—only applies to DNA samples taken after an arrest that occurred on or after 2002.[8]

Appellant responded that his DNA sample in CODIS was apparently taken from him in connection with a sexual assault case dismissed in 1999. Appellant, however, did not argue at the hearing that his DNA sample should have been removed from CODIS after the sexual assault case was dismissed in 1999 pursuant to Government Code section 411.1471(e),[9] nor did he argue that section 411.1471 should be applied retroactively to include his DNA sample. Rather, appellant argued that in 1999, the State was only entitled to collect DNA samples from inmates if a court ordered the inmate to give a sample or if the inmate was serving a sentence for sexual assault. Appellant further contended that because his investigator was unable to find an order "showing that he was ever ordered to give

---

[8] The State also argued that appellant was collaterally estopped from relitigating this issue because he had filed a federal lawsuit to remove his DNA sample from CODIS and the federal district court dismissed his complaint for failure to state a claim pursuant to 28 U.S.C. § 1915. In that lawsuit, appellant alleged that his DNA sample was unlawfully included in CODIS, in violation of state law and the Fourth Amendment, after his 1983 conviction for burglary of a habitation was overturned and he was acquitted.

[9] During the hearing, appellant's counsel acknowledged that the dismissal of the sexual assault case against appellant in 1999 "was of course before the 2002 statute."

10

a DNA sample," "we can only assume that it was taken as a suspect." Appellant argued that because he was a "mere suspect" in the 1999 sexual assault case and never convicted of that crime, the inclusion of the DNA sample acquired from him during that investigation constituted an invasion of his right to privacy under the Fourth Amendment.

Appellant offered no evidence to show that the DNA sample was collected in connection with the dismissed sexual assault case, as opposed to other of his criminal convictions.

## B.    Motion to Suppress Statements

Appellant also filed a separate motion to suppress statements he made to law enforcement during his videotaped interview. In his one-and-a-half page written motion, appellant made several general allegations including, inter alia, that any statements he made to police were "involuntary and were coerced and enticed" and that the statements were "tainted by [his] illegal and unlawful detention and arrest." Appellant argued that the admission of these statements violated various provisions of the U.S. Constitution (i.e., Fourth, Fifth, Sixth, and Fourteenth Amendments), the Texas Constitution (i.e., Article I, sections 9 and 10), and three articles of the Code of Criminal Procedure (i.e., art. 1.05, 38.22, and 38.23). This motion never cites analogous case law or presents meaningful analysis applying these legal authorities to the specific facts of his case. At the pre-trial hearing on

11

his motion, the State introduced a copy of his videotaped interview and called one of the HPD investigators present during the interrogation, Semmelrock, who testified that appellant became a suspect in Marti's murder when DNA taken from the crime scene matched appellant's DNA registered in the national CODlS database. Semmelrock obtained an arrest warrant based on the DNA match and after appellant was arrested on January 9, 2009, he and his partner interviewed appellant after reading him his rights and after giving him crackers and drinks. Appellant verbally acknowledged the rights read to him and voluntarily waived these rights so he could give his statement. On cross-examination, Semmelrock testified that he did not know how CODIS obtained appellant's DNA information.

## Sufficiency of the Evidence

In his first point of error, appellant challenges the sufficiency of the evidence supporting his capital murder conviction. Appellant does not, however, argue that the evidence is insufficient to show that he sexually assaulted Marti. Rather, appellant argues that the evidence is insufficient to show that he murdered Marti or that the murder occurred during the course of the aggravated sexual assault.

## A.     Standard of Review

Appellant acknowledges on appeal that there is evidence that tends to show that he murdered and sexually assaulted Marti, but he argues that the facts which tend to show that he did not commit both the murder and sexual assault

12

overwhelmingly outweigh the evidence to the contrary. Challenges to the legal and factual sufficiency of the evidence are reviewed by this Court under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 318–20, 99 S.Ct. 2781, 2788–89 (1979). *See Ervin v. State*, 331 S.W.3d 49, 52–56 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 894–95, 912–13 (Tex. Crim. App. 2010)).

Under the *Jackson* standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational factfinder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 317–19, 99 S.Ct. at 2788–89; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). Evidence is insufficient under this standard in four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; and (4) the acts alleged do not constitute the criminal offense charged. *See Jackson*, 443 U.S. at 314, 318 n.11, 320, 99 S.Ct. at 2786, 2789 & n.11; *Laster*, 275 S.W.3d at 518; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The *Jackson* standard imbues to the factfinder the responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008) (stating jury is sole judge of credibility of witnesses and weight to give their testimony). An appellate court presumes that the factfinder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. *See Jackson*, 443 U.S. at 326, 99 S.Ct. at 2793; *see also Clayton*, 235 S.W.3d at 778 (reviewing court must "presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination").

Moreover, in our review of the record, direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton*, 235 S.W.3d at 778. In determining the sufficiency of the evidence, a reviewing court examines "whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007)). Finally, the "cumulative force" of all the circumstantial evidence can be sufficient for a jury to find the accused guilty beyond a reasonable doubt, even if every fact does not

"point directly and independently to the guilt of the accused." *Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006).

## B.     Applicable Law

A person commits capital murder if he intentionally causes the death of an individual in the course of committing or attempting to commit an aggravated sexual assault. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(2) (West Supp. 2011). A person commits aggravated sexual assault if he intentionally or knowingly "causes the penetration of the anus or sexual organ of another person by any means, without that person's consent . . ." and "causes serious bodily injury or attempts to cause the death of the victim . . . in the course of the same criminal episode." TEX. PENAL CODE ANN. §§ 22.021(a)(1)(A)(i), (2)(A)(i) (West 2011). The Court of Criminal Appeals has defined "in the course of committing" an offense listed in section 19.03(a)(2) as conduct occurring "in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the offense." *Garrett v. State*, 851 S.W.2d 853, 856 (Tex. Crim. App. 1993).

## C.     Analysis

The record reflects that Marti was found in a location not visible from the street. Her body, swollen and bruised, was nude from the waist down and her genital area was exposed. Investigators at the scene documented the severity of Marti's injuries, including contusions to her face, knees and thighs, hemorrhaging

15

in her eyes, and the bloody tears to her vaginal area. They also observed blood on the walls of the alcove and a sizeable bloodstain underneath where Marti's groin had been after her body was removed. All the evidence was confined to the small alcove where Marti's body was found, indicating that the entire crime took place in that area and she was not moved thereafter. With the notable exception of her pants and panties, all of Marti's personal items were found undisturbed near her body.

Based on comparisons of appellant's DNA sample with the DNA evidence recovered from the scene, DNA analyst Guidry testified that appellant could not be excluded from the semen found on and in Marti's corpse, the bloodstains taken from the east and north wall of the church, and the blue rosary used to strangle her. This was corroborated by Dr. Mitchell's testimony that the marks created by her strangulation matched the beaded blue rosary Marti wore around her neck.

Appellant nonetheless argues that the facts that tend to show that he did not commit both the murder and sexual assault overwhelmingly outweigh the evidence that he did. In particular, appellant relies upon (1) Guidry's testimony that it is not possible to determine when DNA was deposited on an item, (2) Guidry's testimony that some of the swabs were packaged together, which, appellant contends, means that there could have been cross-contamination, (3) Dr. Mitchell's testimony that he did not know if the person who sexually assaulted Marti was the same person

who killed her, and (4) Dr. Mitchell's testimony that it was possible that Marti's sexual assault and murder happened at different times.

Although Dr. Mitchell testified that he did not know if the person who sexually assaulted Marti was the same person who killed her and that it was possible that Marti's murder happened at a different time than the sexual assault, Mitchell also testified that the injuries Marti received from being sexually assaulted (e.g., tears and trauma to her vagina and rectum) occurred at or near the time of her blunt force trauma and asphyxiation injuries. He further testified that because the injuries from Marti's sexual assault showed no evidence of healing and were consistent with the bruises to her face, neck, and body, he concluded that she was beaten, strangled, and sexually assaulted at or near the time of her death. As the sole factfinder and judge of the credibility of the witnesses and weight given to their testimony, the jury was within its province to resolve any conflicts in the testimony and to believe Dr. Mitchell's testimony that the murder occurred at or near the time of the aggravated sexual assault. *See Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Clayton*, 235 S.W.3d at 778; *Brown*, 270 S.W.3d at 568.

Second, Guidry testified that the DNA analysis linked appellant to both the semen found inside Marti's vagina and rectum and the DNA on the rosary used to strangle her. Although she acknowledged that DNA analysis could not determine precisely when appellant deposited the DNA, viewed in the light most favorable to

17

the verdict, it was reasonable for the jury to infer from both Guidry's and Dr. Mitchell's testimony that the murder occurred at or near the time of the aggravated sexual assault and that appellant left his DNA at the crime scene at or near the time he murdered Marti. *See Clayton*, 235 S.W.3d at 778.

Third, contrary to appellant's assertion, Guidry's acknowledgement that some swabs were packaged together does not suggest the possibility of cross-contamination. Guidry, who testified at length regarding the safeguards and controls followed by her and the crime laboratory, stated that "[s]wabs from the same item will be packaged together, because they are the same item. We treat them as the same item." Guidry further explained that "all the vaginal swabs are received packaged together, all of the rectal swabs were received packaged together. The necklace swabs that were from different necklaces would have been packaged separately."

In sum, the evidence presented at trial supported the jury's verdict that appellant murdered Marti during the course of committing aggravated sexual assault, where the medical examiner testified that the murder occurred at or near the time of the aggravated sexual assault, and appellant's DNA linked him to the sexual assault and the rosary used to strangle Marti. *See Powell*, 194 S.W.3d at 507 (stating it is not necessary that every fact point directly and independently to defendant's guilt if conclusion is warranted by their combined and cumulative

force). When the evidence is viewed in a light most favorable to the verdict, the jury reasonably could have inferred that appellant murdered Marti during the course of committing aggravated sexual assault, and found the elements of capital murder beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *see also Muniz v. State*, 851 S.W.2d 238, 249 (Tex. Crim. App. 1993) (finding evidence sufficient to support defendant's conviction for capital murder where factor that made sexual assault aggravated caused victim's death).

We overrule appellant's first point of error.

### Motions to Suppress—Evidence of DNA Comparison and Statements to Law Enforcement

In his second and third points of error, appellant contends that the trial court erred by denying his motions to suppress his DNA sample in CODIS and statements he made to law enforcement during a videotaped interview.

### A.    Preservation of Error

A motion to suppress is a specialized objection to the admission of evidence. *Rothstein v. State*, 267 S.W.3d 366, 373 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). "[A] complaint is not preserved for appeal unless it was made to the trial court 'by a timely request, objection or motion' that 'stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific

grounds were apparent from the context.'" *Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009) (quoting TEX. R. APP. P. 33.1); *see also* TEX. R. EVID. 103.

To preserve error, a party "must be specific enough so as to 'let the trial [court] know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it.'" *Resendez*, 306 S.W.3d at 313 (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). A party fails to preserve error when the contention urged on appeal does not comport with the specific complaint made in the trial court. *See Rothstein*, 267 S.W.3d at 373.

We consider the context of the complaint to determine if the party preserved error. *See Resendez*, 306 S.W.3d at 313. Accordingly, we review appellant's motion to suppress and the suppression hearing to determine if the complaint was apparent from the context. *See id.* at 314–16; *Rothstein*, 267 S.W.3d at 374–75 & n.5. If the correct ground for exclusion was obvious to the trial court and opposing counsel, waiver will not result from a general or imprecise objection. *Zillender v. State*, 557 S.W.2d 515, 517 (Tex. Crim. App. 1977). However, if the context shows that a party failed to effectively communicate his argument, then the error is deemed waived on appeal. *Lankston*, 827 S.W.2d at 909.

"Global statements" in a written motion to suppress are not sufficient to preserve arguments for appeal. *Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim.

20

App. 2005) (citing TEX. R. APP. P. 33.1). Therefore, a party waives error when (1) a suppression motion makes global arguments citing little more than constitutional and statutory provisions and (2) the party fails to argue any specific grounds for suppressing evidence at the suppression hearing. *See Swain*, 181 S.W.3d at 365.

## B.      Standard of Review

The appropriate standard for reviewing a trial court's ruling on a motion to suppress evidence is bifurcated, giving almost total deference to a trial court's determination of historical facts and reviewing de novo the court's application of the law. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). We must "afford the same amount of deference to [a] trial courts' rulings on application of law to fact questions, also known as mixed questions of law and fact, if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) (internal quotations omitted). We conduct a de novo review when the resolution of mixed questions of law and fact do not turn on an evaluation of credibility and demeanor. *See id.*

In determining whether a trial court's decision is supported by the record, we generally consider only the evidence adduced at a suppression hearing unless the parties consensually re-litigate the issue at trial, in which case we also consider relevant trial testimony. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App.

21

1996). We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). At a suppression hearing, a trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility. *Maxwell*, 73 S.W.3d at 281. Accordingly, a trial court may choose to believe or to disbelieve all or any part of a witness's testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

## C.     Evidence of DNA Comparison

In his second point of error, appellant argues that his DNA sample was obtained by law enforcement during the investigation of a sexual assault charge against him, and that the sample and profile should have been destroyed after the charge was dismissed in 1999 pursuant to Government Code section 411.1471. Appellant further contends that because his DNA profile was unlawfully in CODIS pursuant to Government Code section 411.1471(e), the trial court erred by denying his motion to suppress the DNA comparison results derived from his CODIS profile pursuant to Code of Criminal Procedure 38.23. *See* TEX. CODE CRIM. P. 38.23 (requiring exclusion of evidence that was unlawfully obtained).

Section 411.1471(b) sets out that after a defendant has been indicted or has waived indictment for one of several felony offenses, including sexual assault, the

22

court in which the case is pending shall require the defendant to provide "one or more specimens for the purpose of creating a DNA record." TEX. GOV'T CODE ANN. § 411.1471(b) (West 2012). Section 411.1471(e) further provides that if that defendant is later acquitted or the case against him is dismissed, the "the court shall order the law enforcement agency taking the specimen to immediately destroy the record of the collection of the specimen and require the department to destroy the specimen and the record of its receipt." *Id.* at § 411.1471(e) (West 2012). This section, which went into effect on September 1, 2001, only applies "to a defendant arrested on or after February 1, 2002." Act of June 17, 2001, 77th Leg., ch. 1490 §§ 2, 9 (amended 2007, 2011) (current version at TEX. GOV'T CODE ANN. § 411.1471).

A defendant who moves for suppression under article 38.23 due to the violation of a statute has the burden of producing evidence of a statutory violation. *State v. Robinson*, 334 S.W.3d 776, 778–79 (Tex. Crim. App. 2011) (citing *Pham v. State*, 175 S.W.3d 767, 772 (Tex. Crim. App. 2005)). Only when this burden is met does the State bear a burden to prove compliance. *Robinson*, 334 S.W.3d at 778–79. This procedure is substantially similar to that required when there is a motion to suppress under the Fourth Amendment, but it is a separate inquiry based on separate grounds. *Id.*

First, although appellant raised two bases for suppression of the DNA profile in his written motion (i.e., Government Code section 411.1471/Code of Criminal Procedure article 38.23 and the right to be free from unlawful searches and seizures pursuant to the Fourth Amendment of the U.S. Constitution and article 1, section 9 of the Texas Constitution), he only argued at the suppression hearing that the inclusion of his DNA profile violated the Fourth Amendment. Specifically, appellant argued that because he was a "mere suspect" in the 1999 sexual assault case and he was never convicted of that crime, the inclusion of the DNA sample acquired from him during the course of that investigation constituted an invasion of his rights under the Fourth Amendment.[10] Appellant did not argue at the hearing that his DNA should have been suppressed under Code of Criminal Procedure article 38.23 because it was included in CODIS in violation of Government Code section 411.1471. In fact, appellant seemingly abandoned this argument when he acknowledged during the hearing that Government Code section 411.1471 was not enacted until after the sexual assault case was dismissed. *See Rothstein*, 267 S.W.3d at 373 (stating party fails to preserve error when contention urged on appeal does not comport with specific complaint made in trial court).

---

[10] Appellant does not argue on appeal that the inclusion of his DNA information in CODIS is a violation of his Fourth Amendment rights. As such, he has not preserved this issue for our review. *See* TEX. R. APP. P. 38.1(i).

Second, even if appellant preserved this issue for our review, the trial court did not abuse its discretion when it denied appellant's motion to suppress based on Code of Criminal Procedure article 38.23 and Government Code section 411.1471 because appellant did not produce evidence of a statutory violation. *Robinson*, 334 S.W.3d at 778–79 (stating defendant who moves for suppression under article 38.23 due to violation of statute has burden of producing evidence of statutory violation). Although appellant argued at the suppression hearing and on appeal that his DNA sample in CODIS was apparently taken from him in connection with the sexual assault case that was dismissed in 1999, he offered no evidence as to when his DNA sample was actually acquired by law enforcement. *Id.* The record reflects that among appellant's history of arrests and convictions was the offense of unauthorized use of a motor vehicle in March 2000 for which he was sentenced to twelve years in TDCJ and that appellant was on community supervision until 2011. *See generally* TEX. GOV'T CODE ANN. § 411.148(a)(1)(B), (b) (section enacted in 2005 requiring all prison inmates to provide blood samples or other specimens to be included in CODIS DNA database); TEX. CODE CRIM. PROC. ANN. art. 42.12, § 11(j) (West Supp. 2012) ("A judge granting community supervision to a defendant convicted of a felony shall require that the defendant, as a condition of community supervision, provide a DNA sample under Subchapter G, Chapter 411, Government Code, for the purpose of creating a DNA record of the defendant,

unless the defendant has already submitted the required sample under other state law."). If appellant's DNA was acquired during either of these interactions (or if he voluntarily gave a sample in order to be excluded as a suspect in another crime), Government Code section 411.1471(e) would not require the destruction of the DNA specimen and profile. Moreover, even if appellant established that his DNA was acquired in connection with the 1999 sexual assault case, appellant did not establish that Government Code section 411.1471 required the removal of his DNA from CODIS, particularly in light of appellant's acknowledgement that Government Code section 411.1471 was not enacted until after the sexual assault case was dismissed in 1999. ("This was of course before the 2002 statute.") Thus, appellant failed to produce evidence of a statutory violation. *See Robinson*, 334 S.W.3d at 778–79.

Although appellant argues on appeal that Government Code section 411.1471 applies to DNA specimens taken before the section's effective date of September 1, 2001, and that the application of this section retroactively does not violate the prohibition against ex post facto laws, appellant did not raise this argument in his written motion to suppress or during the suppression hearing. Accordingly, even were it necessary to reach this issue, appellant's argument that Government Code section 411.1471 should be applied retroactively to bar the State

26

from using the DNA comparison results derived from his CODIS profile has not been preserved for our review.

Appellant further argues that the trial court's denial of his motion to suppress was error because the State presented no evidence that his DNA sample was properly taken "in contravention of a state statute which requires a court order for the taking." However, because appellant moved for suppression under article 38.23 due to the violation of a statute, he had the burden of producing evidence of a statutory violation. *Robinson*, 334 S.W.3d at 778–79. Since Appellant did not meet his burden, the burden never shifted to the State to prove compliance. *Id.*

We overrule appellant's second point of error.

**D.     Statements to Law Enforcement**

In his third point of error, appellant contends that the trial court erred in denying his motion to suppress statements he made to law enforcement during a videotaped interview because the statements were "rendered involuntary from [the officers'] coercion."

Appellant does not articulate a factual basis for his coercion claim or identify any coercive tactics allegedly employed by the officers, either in his appellate brief or at the trial court level. In his one-and-a-half-page motion to suppress, appellant makes several generalized allegations including, inter alia, that any statements he made to police were "involuntary and were coerced and enticed"

27

and that the statements were "tainted by [his] illegal and unlawful detention and arrest." At the suppression hearing, appellant did not argue that his statements were involuntary or coerced, nor did he attempt to elicit testimony supporting this allegation. Instead, appellant focused his attention on proving another ground for suppression (i.e., that the statements were the fruit of his illegal and unlawful detention and arrest and should be suppressed under Code of Criminal Procedure article 38.23). *See* TEX. CODE CRIM. P. art. 38.23 (requiring exclusion of evidence that was unlawfully obtained). In fact, appellant devoted his entire cross-examination of Officer Semmelrock—one of the officers who conducted the interrogation and the only witness to testify at the hearing—to the facts underlying the identification of appellant as a suspect (i.e., the discovery that appellant's DNA profile in CODIS matched DNA taken from the crime scene).

We note that the section of appellant's brief that addresses his third point of error contains no citations to the record or any meaningful analysis of the cited legal authorities to the specific facts of his case. As such, appellant's third point of error was inadequately briefed. *See* TEX. R. APP. P. 38.1(i). However, even if appellant had adequately briefed this point of error, he would still not be entitled to relief. After reviewing appellant's written motion to suppress and the transcript of the suppression hearing, we hold that appellant failed to preserve for our review his argument that his statements to law enforcement were coerced, and therefore

28

involuntary, and should have been excluded under Code of Criminal Procedure article 38.23. *See Swain*, 181 S.W.3d at 365 (holding party waives error when suppression motion makes global arguments citing little more than constitutional and statutory provisions and party fails to argue specific ground for suppressing evidence at suppression hearing); *Lugo v. State*, 299 S.W.3d 445, 450 (Tex. App.—Fort Worth 2009, pet. ref'd) ("[T]he complaint made on appeal must comport with the complaint made in the trial court or the error is forfeited.").

We overrule appellant's third point of error.

## E.   Admission of Crime Scene Photographs

In his fourth point of error, appellant contends that the trial court erred by admitting eight crime scene photographs of Marti (State's Exhibits 20 and 59–65) in violation of Rule of Evidence 403. According to appellant, all eight photographs were gruesome in nature and should have been excluded on the basis that they were more prejudicial than probative. Tex. R. Evid. 403.

### 1.   Standard of Review and Applicable Law

Rule of Evidence 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. We review the trial court's ruling on admissibility of the photographs under an abuse

of discretion standard and will not reverse the trial court's ruling unless it falls outside the zone of reasonable disagreement. *See Young v. State*, 283 S.W.3d 854, 874 (Tex. Crim. App. 2009); *see also Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995).

When determining whether the trial court erred in admitting relevant photographs into evidence, our review is limited to determining whether the probative value of the photos is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence. *Young*, 283 S.W.3d at 874; TEX. R. EVID. 403.

Our analysis under Rule 403 includes, but is not limited to, the following factors: (1) the probative value of the evidence, (2) the potential to impress the jury in some irrational yet indelible way, (3) the time needed to develop the evidence, and (4) the State's need for the evidence. *Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012); *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). In determining whether the probative value of a photograph is substantially outweighed by the danger of unfair prejudice, we also consider "the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close-up, whether the body depicted is clothed or naked, the availability of other means of proof, and other

circumstances unique to the individual case." *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009).

### 2. Analysis

The eight photographs admitted were in conjunction with the testimony of forensic investigator Vanessa Trevino and HPD Officer Sheridan Langford, a crime scene investigator who, together with Trevino, documented the crime scene and the extent of Marti's injuries. Although the photographs included in the appellate record are black and white, it appears from the reporter's record that color photos were admitted into evidence and that these were displayed in the courtroom on an overhead projector.

State's Exhibit 20 shows Marti's partially-clad body lying on the floor of the narrow alcove, wearing a sweater, one tennis shoe, and an ankle bracelet. Officer Langford used Exhibit 20 to explain the position of Marti's body when she was found and other objects found in the alcove, including a second tennis shoe, rosary beads, a necklace with a crucifix, a drawstring mesh bag that contained Marti's belongings, and a blue-green towel. Brennan, the administrative assistant who discovered Marti's body and called 9-1-1, also used Exhibit 20 to explain to the jury the location and condition of Marti's body when she was found.

State's Exhibits 59–65 are close-up photographs of Marti's body that show what forensic investigator Trevino observed at the crime scene. In particular,

31

Exhibit 59 is a close-up of Marti's face and neck that shows contusions on the right side of her face and on her right eye, as well as the rosary that was used to strangle her. Exhibit 60 is a close-up photograph of Marti's eye and eyelid that shows petechial hemorrhaging which, according to Trevino, indicates "some type of obstruction or trauma to the airway or blunt force impact." Exhibits 61 and 62 are close-up photographs of the front of Marti's bare legs and thighs that show contusions and abrasions on both of her knees, blood on her upper thigh, and multiple contusions on her upper thigh. Exhibit 63 is a close-up photograph of Marti's genital area that shows blood on the upper inside of the thigh as well as on her buttocks. Exhibit 64 is a photograph that was taken after Marti's body was removed from the alcove and placed on a body bag. The photograph shows dirt on Marti's bare lower back. Exhibit 65 is a close-up photograph of blood, fecal matter, and other materials on Marti's bare buttocks and the backside of her upper thighs.

All eight photographs are probative because they are accurate depictions of both the crime scene and Marti's body that would assist a jury to visualize the crime scene as well as the extent of Marti's injuries, and they corroborate Langford's, Trevino's, and Brennan's observations of the crime scene and Marti's injuries. *See Williams*, 301 S.W.3d at 691 (photographs were probative because they depicted both crime scene and victim's injuries); *Chamberlain v. State*, 998

S.W.2d 230, 237 (Tex. Crim. App. 1999) (affirming admission of crime scene photos corroborating witness testimony). Exhibits 59 and 60, which show contusions to Marti's face and petechial hemorrhaging in one of her eyes, are also probative because they corroborate the medical examiner's testimony regarding Marti's cause of death (i.e., blunt force trauma to the head and strangulation). *See Chamberlain*, 998 S.W.2d at 237. Exhibits 61–65 are also probative of sexual assault and murder because they depict the force used against Marti and the extent of the injuries inflicted upon her during that assault.

There were no eyewitnesses to the murder and sexual assault, and thus, aside from these photographs, the only other evidence available to the State to establish the condition of Marti's body, the force used against Marti, and the extent of the injuries inflicted upon her during that assault was the testimony of the various witnesses present at the crime scene and the medical examiner. The witnesses' testimony is undeniably enhanced by the corroborating photos. *See Chamberlain*, 998 S.W.2d at 237 ("Visual evidence accompanying testimony is most persuasive and often gives the fact finder a point of comparison against which to test the credibility of a witness and the validity of his conclusions.").

These photographs are relevant and probative, and although disagreeable to look at, there is nothing in the record to suggest that these photographs were "offered solely to inflame the minds of the jury." *Erazo v. State*, 144 S.W.3d 487,

491–92 (Tex. Crim. App. 2004) ("If a photograph is competent, material and relevant to the issue on trial, it is not rendered inadmissible merely because it is gruesome or might tend to arouse the passions of the jury, unless it is offered solely to inflame the minds of the jury.") As such, we cannot conclude that the images appealed only to the jury's emotional side and that the jury's decision was based on emotion rather than the relevant evidence introduced at trial. Finally, considering the length of the trial, the State took a reasonable amount of time before the jury to lay the foundation for the photographs and introduce them into evidence.

Unquestionably disagreeable to look at, these photographs are highly probative and they depict nothing more than the reality of the brutal crimes committed against Marti. *See Shuffield*, 189 S.W.3d at 788 (holding court did not abuse its discretion by admitting photographs that only showed complainant's injuries and were no more gruesome than expected); *Sosa v. State*, 230 S.W.3d 192, 196 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (stating prejudice caused by photographs did not substantially outweigh their probative value; photographs were no more gruesome than facts of offense). Considering the probative value of the evidence, the potential to impress the jury in some irrational yet indelible way, the time needed to develop the evidence, and the State's need for the evidence, we cannot say that the trial court abused its discretion when it

34

determined that the probative value of these photographs outweighed their prejudicial impact. *See Hernandez*, 390 S.W.3d at 324; *Shuffield*, 189 S.W.3d at 787.

Appellant's fourth point of error is overruled.

## Conclusion

We affirm the trial court's judgment.

Jim Sharp
Justice

Panel consists of Chief Justice Radack and Justices Sharp and Massengale.

Do not publish. TEX. R. APP. P. 47.2(b).